NO. 25-2281

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,
Appellant

v.

MELVIN WILLIAMS,
Appellee

APPEAL FROM ORDER GRANTING RELIEF UNDER 28 U.S.C. § 2255,
AND FROM AMENDED JUDGMENT OF SENTENCE,
IN CRIMINAL NO. 94-196-01 IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRIEF FOR APPELLANT UNITED STATES OF AMERICA

DAVID METCALF
United States Attorney

ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals

615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
(215) 861-8568

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT.................................................1

    I.    Subject Matter Jurisdiction.........................................1

    II.    Appellate Jurisdiction ..............................................1

STATEMENT OF ISSUE ..................................................... 2

STATEMENT OF THE CASE ............................................... 3

    A.    Overview............................................................ 3

    B.    Factual Background ........................................... 4

    C.    Procedural History............................................ 11

    D.    Other Prosecutions and Conduct in Prison .....................14

    E.    Post-Sentencing Proceedings in the Instant Case...............................................17

STATEMENT OF RELATED CASES............................................ 27

SUMMARY OF ARGUMENT .................................................... 28

ARGUMENT ........................................................... 33

    THE DISTRICT COURT ERRED IN GRANTING RELIEF UNDER SECTION 2255 ....................................... 33

CONCLUSION ......................................................... 54

# TABLE OF AUTHORITIES

## Cases

*Baugh v. United States,*
    64 F.4th 779 (6th Cir. 2023) ................................................. 40

*Bousley v. United States,*
    523 U.S. 614 (1998) ............................................................... 40

*Brecht v. Abrahamson,*
    507 U.S. 619 (1993) ....................................................... passim

*Brown v. United States,*
    942 F.3d 1069 (11th Cir. 2019) ........................................... 37

*Calderon v. Coleman,*
    525 U.S. 141 (1998) ............................................................... 51

*Chapman v. California,*
    386 U.S. 18 (1967) ....................................... 30, 39, 41-43, 51

*Defoy v. McCullough,*
    393 F.3d 439 (3d Cir. 2005) ................................................ 20

*Fry v. Pliler,*
    551 U.S. 112 (2007) ............................................................... 42

*Garlotte v. Fordice,*
    515 U.S. 39 (1995) ................................................................. 20

*Gray v. United States,*
    980 F.3d 264 (2d Cir. 2020) ................................................ 38

*Hawk v. Olson,*
    326 U.S. 271 (1945) ................................................................ 41

*Johnson v. United States,*
    139 F.4th 830 (9th Cir. 2025) .............................................. 40

*Johnson v. United States,*
  576 U.S. 591 (2015) ...............................................................18

*Kotteakos v. United States,*
  328 U.S. 750 (1946) .............................................................. 42

*Mathis v. United States,*
  579 U.S. 500 (2016) .............................................................. 36

*O'Neal v. McAninch,*
  513 U.S. 432 (1995) ....................................................... 44, 53

*Parke v. Raley,*
  506 U.S. 20 (1992) .................................................................41

*Richardson v. Marsh,*
  481 U.S. 200 (1987) .............................................................. 50

*Richardson v. United States,*
  526 U.S. 813 (1999) .............................................................. 36

*Stone v. United States,*
  37 F.4th 825 (2d Cir. 2022) ................................................. 40

*United States v. Barrett,*
  937 F.3d 126 (2d Cir. 2019) ................................................ 37

*United States v. Bates,*
  960 F.3d 1278 (11th Cir. 2020) ........................................... 38

*United States v. Bentley,*
  49 F.4th 275 (3d Cir. 2022) ................................................. 42

*United States v. Bullock,*
  970 F.3d 210 (3d Cir. 2020) ................................................ 38

*United States v. Butler,*
  141 F.4th 1136 (10th Cir. 2025) .......................................... 38

*United States v. Cepero,*
    224 F.3d 256 (3d Cir. 2000) ............................................................ 33

*United States v. Davis,*
    588 U.S. 545 (2019) ..............................................................18, 35

*United States v. Davis,*
    875 F.3d 592 (11th Cir. 2017) ...................................................... 36

*United States v. Frady,*
    456 U.S. 152 (1982) ...............................................................41

*United States v. Hari,*
    67 F.4th 903 (8th Cir. 2023) .......................................................... 40

*United States v. Heyward,*
    3 F.4th 75 (2d Cir. 2021) ............................................................ 40

*United States v. Larkin,*
    629 F.3d 177 (3d Cir. 2010) ......................................................... 26

*United States v. Lewis,*
    907 F.3d 891 (5th Cir. 2018) ........................................................ 37

*United States v. McDaniel,*
    85 F.4th 176 (4th Cir. 2023) ........................................................ 38

*United States v. Rafidi,*
    829 F.3d 437 (6th Cir. 2016) ........................................................ 38

*United States v. Reed,*
    48 F.4th 1082 (9th Cir. 2022) ....................................................... 40

*United States v. Said,*
    26 F.4th 653 (4th Cir. 2022) ................................................40, 44

*United States v. Scott,*
    14 F.4th 190 (3d Cir. 2021) ......................................................... 38

*United States v. Simms,*
    914 F.3d 229 (4th Cir. 2019) .................................................. 37

*United States v. States,*
    72 F.4th 778 (7th Cir. 2023) ................................................. 38

*United States v. Stevens,*
    70 F.4th 653 (3d Cir. 2023) .................................................. 49

*United States v. Taylor,*
    596 U.S. 845 (2022).............................................................. 36

*United States v. Theodoropoulos,*
    866 F.2d 587 (3d Cir. 1989)................................................. 43

*United States v. Williams,*
    520 F.3d 414 (5th Cir. 2008) ...............................................16

*United States v. Williams,*
    1996 WL 741886 (E.D. Pa. 1996)........................................12

*United States v. Wilson,*
    960 F.3d 136 (3d Cir. 2020) ........................................passim

## Statutes and Rules

18 U.S.C. § 2........................................................................12

18 U.S.C. § 111 ...........................................................passim

18 U.S.C. § 371 ............................................... 11, 12, 19, 37

18 U.S.C. § 759 ...................................................................15

18 U.S.C. § 922(g) ............................................................. 11

18 U.S.C. § 924(c) .......................................................passim

18 U.S.C. § 1114 ..................................................................... passim

18 U.S.C. § 1951 ............................................................. 12, 19, 35, 45

18 U.S.C. § 3231 ................................................................................. 1

28 U.S.C. § 1291 ................................................................................. 1

28 U.S.C. § 2255 ..................................................................... passim

U.S.S.G. § 3B1.1 ............................................................................ 13

U.S.S.G. § 4B1.2(a) ...................................................................... 38

# JURISDICTIONAL STATEMENT

## I. Subject Matter Jurisdiction

The defendant was convicted of federal criminal offenses, in a matter over which the district court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. The district court had jurisdiction pursuant to 28 U.S.C. § 2255 to consider the defendant's collateral petition under that statute.

## II. Appellate Jurisdiction

Based upon the timely filing of a notice of appeal from the amended judgment in a criminal case entered on May 15, 2025, this Court has jurisdiction over this matter under 28 U.S.C. § 1291.

**STATEMENT OF ISSUE**

Did the district court err in invalidating a count of conviction under 18 U.S.C. § 924(c), and therefore in proceeding to resentence the defendant?

## STATEMENT OF THE CASE

### A.    Overview.

In 1993 and early 1994, defendant/appellee Melvin Williams was the leader of a Philadelphia crew that repeatedly engaged in armed robberies of drug dealers. Their crime spree came to an end on March 16, 1994, in an explosion of violence. On that day, FBI agents were tipped off that Williams and others were on their way to commit a robbery, and they stopped the suspects' car on North Broad Street in Philadelphia. As agents then approached the vehicle, Williams ordered his compatriots to open fire. A shootout ensued in broad daylight, in which one of Williams' confederates was killed and two FBI agents were gravely wounded.

Williams was ultimately convicted of numerous charges related to the year-long robbery spree and the final shootout, and was sentenced to a term of imprisonment of 384 months. That term included a mandatory minimum sentence of 60 months on a firearm charge under 18 U.S.C. § 924(c), consecutive to sentences totaling 324 months on the other counts. Williams completed that term in 2022. However, he remained in custody on consecutive terms he received for subsequent crimes: a 22-month sentence for escape, and a 150-month sentence based on a brutal assault on a prison guard Williams committed in 2006.

In the original case, more recently, Williams sought and obtained relief under 28 U.S.C. § 2255. The district court, in the ruling challenged in this appeal, held that the count of conviction in this case under 18 U.S.C. § 924(c) was invalid, as it rested on multiple alleged "crimes of violence," two of which are valid predicates under current law and two of which are not. The court then proceeded to resentence the defendant. It determined that Williams had served sufficient time, and it reduced the original 384-month sentence, over the government's objection, by far more than 60 months, to a new total term of 247 months, in order to assure his immediate release. That action had the effect of essentially negating the prison sentence imposed for the prison assault.

In this appeal, the government challenges the court's ruling regarding the 924(c) conviction, asserting that the decision was incorrect, and therefore the motion under 28 U.S.C. § 2255 should have been denied and the subsequent resentencing should be vacated.

## B.    Factual Background.[1]

For approximately one year, beginning in 1993, Williams, when he was 18 and then 19 years old, led a group that referred to itself as the

_____

[1] This statement of facts is based on the statement presented by the government to the Court of Appeals in Williams' direct appeal, No. 98-1130,

*continued* . . .

"squad," that committed hundreds of violent armed robberies of drug dealers. This group included Thurston Cooper, Jermaine Lipscomb, and Larry Johnson. The men used numerous weapons, including a MAC-11 machine pistol and an Uzi rifle, and physically assaulted and shot at resisting victims. They targeted drug dealers on the theory that these victims were less likely to report the thefts to the police, and that the authorities were less likely to prosecute these crimes.

According to Cooper, some of the squad's robberies were random armed robberies of street corner drug dealers during which the group obtained, among other things, cash and crack cocaine. Other robberies were planned in advance, and through these robberies the group obtained, among other things, cash, crack cocaine, and numerous weapons which became part of the arsenal of Williams' squad. According to both Cooper and Jackson, the crack cocaine which had been obtained during the robberies was later resold by members of Williams' squad from, among other places, a house Williams controlled at 1509 Rowan Street in Philadelphia.

---

in which the Third Circuit affirmed the judgment of conviction and sentence. It is also consistent with the original presentence report in this case, as revised February 9, 1998 (referred to as "Orig. PSR"). The government is filing that report under seal, along with a supplemental PSR prepared for resentencing, as revised September 16, 2024 ("Supp. PSR").

In one robbery described by the witnesses, in December 1993, Melvin Williams and Thurston Cooper attempted to commit an armed robbery of two drug dealers. During this attempted robbery, a sawed-off shotgun, carried by Cooper, accidentally fired. Williams then shot at one of the drug dealers. He and Cooper fled the area before police arrived. Orig. PSR ¶ 12.

The presentence report added: "On occasion, Williams reportedly disciplined some of the Squad members by not allowing them to sell crack cocaine from 1509 Rowan Street, refusing to allow them to participate in the armed robberies and by encouraging other members to treat them as an outcast. On one occasion, Williams reportedly disciplined a person known to have stolen the Squad's crack cocaine by locating this person and choking and stomping him. In the winter of 1993/94, Tremaine Jackson, Jermaine Lipscomb and Thurston Cooper took some of the Squad's weapons and fired them at the Broad Street Exit sign on the Expressway. When they returned to Rowan Street, Melvin Williams disciplined them by requiring them to purchase twice the quantity of ammunition that they used." Orig. PSR ¶ 15.

In about December 1993, Williams permitted Tremaine Jackson to join the squad and sell crack cocaine – which had been stolen during the robberies – from 1509 Rowan Street. Once Jackson joined the squad, he

became a dedicated worker of Williams. On some days, Jackson spent the entire day selling crack cocaine for Williams from inside of 1509 Rowan Street. Williams paid Jackson a percentage of the crack cocaine sales, usually totaling several hundred dollars per week, for his work on behalf of the squad.

While Jackson was working for Williams selling the stolen crack cocaine, Jackson talked to Williams, Cooper, and the other squad members about the armed robberies of drug dealers and about the violence used by Williams and the other squad members during the commission of these robberies. Williams advised this crew that they would use the many weapons they stored to shoot at the police if the police were to raid 1509 Rowan Street. During this same time period, Jackson repeatedly asked Williams for permission to join the other squad members during the armed robberies. Williams usually would respond that Jackson was not yet ready to participate in the armed robberies, but reassured him that his time would come.

On March 16, 1994, Williams gave Tremaine Jackson his first opportunity to participate in an armed robbery of a drug dealer with other members of the squad. That morning, Williams and Jackson attended a court hearing for Thurston Cooper, who had been arrested a few days

earlier by the Philadelphia Police. At the hearing, Cooper's bail was reduced. After the hearing, Williams told Jackson that he wanted to commit an armed robbery of a drug dealer to raise the bail money for Cooper. Jackson agreed to join in the armed robbery with Williams and another squad member, Jermaine Lipscomb, who was Williams' cousin.

To prepare for the robbery, Williams and Jackson traveled to retrieve the guns that Williams had left for safe keeping with a friend of his (having been evicted a short time earlier from the Rowan Street property). Williams retrieved three guns and armed himself with two loaded .38 caliber handguns. Williams provided Jackson with the third gun, a loaded .380 caliber semi-automatic pistol. Lipscomb possessed a .45 caliber pistol.

Williams telephoned another member of the squad, Larry Johnson, to have Johnson join in the robbery. Johnson declined because the robbery would have to be done during the daytime, which was unusual for the squad. Williams decided to do the robbery anyway because Williams wanted to get his good friend Thurston Cooper out of jail as soon as possible. Williams' plan for the robbery had Jackson going to the door of the targeted drug dealer and putting a gun to his head while Williams and Lipscomb ran into the house and completed the robbery.

Once Williams, Jackson, and Lipscomb were armed and ready, Williams had Wayne Caldwell drive them to the target of the armed robbery in Caldwell's black Hyundai automobile. Unbeknownst to Williams, Caldwell was an FBI informant, and he advised agents of what was transpiring. What ensued was a violent gun battle in broad daylight on North Broad Street in Philadelphia, when FBI agents, tipped off to the squad's mission, attempted to stop them.

While en route to commit the armed robbery, at a stop light, Lipscomb spotted FBI agents approaching the Hyundai on Broad Street and announced to Williams and Jackson to look out because "5-0," meaning the police, were approaching. As the presentence report stated: "After hearing this warning, Williams directed Jackson and Lipscomb to shoot at the agents. At Williams' direction, Jackson fired the first shot from the .380 caliber pistol as the agents approached the vehicle. Jermaine Lipscomb then grabbed the .380 caliber pistol that had been fired by Jackson and fired at the FBI agents." Orig. PSR ¶ 20. Williams himself did not fire the guns he possessed.

Both Agent Richard Macko and Agent Timothy Turck were hit and seriously wounded by the gunfire. Lipscomb was killed when agents returned fire. Williams and Jackson were wounded, while Caldwell was

unharmed. Jackson had three gunshot wounds to the knee (two of which were superficial), one superficial wound to the buttocks, and a wound to his right forearm. Williams had a skin break on his back caused by broken glass and a small graze wound on the right side of his scalp. A small piece of metal was also removed from Williams' scalp.

Agent Macko was struck in the chin with a .380 caliber bullet, which traveled through his neck, lodged near his collarbone, and nearly killed him. He was hospitalized for three days, then missed 45 days of work while recovering. Turck was hit with a .380 caliber bullet in the left hand, which traveled up his forearm, shattering bones in his wrist. He was also hospitalized for several days, and underwent unsuccessful reconstructive surgery which necessitated a bone graft to replace several inches of his shattered ulnar bone. Two permanent metal screws were placed in the wrist to reattach it to the hand. Despite the surgery, his wrist and hand were permanently injured, causing limited mobility, strength, and grip. Medications were prescribed for excruciating pain associated with this injury. He was out of work for six months, and later underwent additional surgery.

## C.    Procedural History.

On May 4, 1994, a federal grand jury returned an indictment focused on the events of March 16, 1994. It charged Melvin Williams with one count of conspiracy to kill and assault agents of the FBI, in violation of 18 U.S.C. § 371, two counts of attempting to kill agents of the FBI, in violation of 18 U.S.C. § 1114, two counts of forcibly assaulting, resisting, and impeding agents of the FBI, in violation of 18 U.S.C. § 111(a)(1), one count of carrying and using a firearm in relation to a violent crime, in violation of 18 U.S.C. § 924(c), and one count of possession of firearms by a felon, in violation of 18 U.S.C. § 922(g).

On September 19, 1994, on the first day of trial, Williams entered a guilty plea to the charge of possession of firearms by a felon. Williams and codefendant Tremaine Jackson proceeded to trial on the remaining charges.

On October 12, 1994, following a jury trial, Williams and Jackson were both convicted on each of the charges against them. On February 2, 1995, Williams was sentenced by Judge Clifford Scott Green to a total of 334 months' imprisonment on all counts.

Subsequently, the government disclosed to counsel for Williams and Jackson that by the time of the trial in September 1994 an administrative

investigation being conducted by the FBI had gathered information relating to the credibility of former agent Timothy Turck (one of the witnesses at the trial), regarding medication Turck took and his misuse of a credit card. Williams and Jackson filed motions for a new trial. By order dated December 10, 1996, the court granted the motions for a new trial. *See United States v. Williams*, 1996 WL 741886 (E.D. Pa. Dec. 10, 1996).

On March 6, 1997, a federal grand jury returned a superseding indictment charging Melvin Williams and Tremaine Jackson with the additional crime of conspiracy to commit Hobbs Act robbery, and removing the felon-in-possession charge. The superseding indictment charged Williams with conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count One); conspiracy to assault and kill federal agents, in violation of 18 U.S.C. § 371 (Count Two); attempt to kill federal agents, and aiding and abetting, in violation of 18 U.S.C. §§ 1114 and 2 (Counts Three and Four); assaulting and resisting federal agents, and aiding and abetting, in violation of 18 U.S.C. §§ 111 and 2 (Counts Five and Six); and using and carrying a firearm during and in relation to a crime of violence, and aiding and abetting, in violation of 18 U.S.C. §§ 924(c) and 2 (Count Eight).

The new charge of Hobbs Act conspiracy (Count One) was based on Williams' involvement in the year-long series of armed robberies of drug

dealers that preceded the shooting of the two FBI agents on March 16, 1994. The basis for the conspiracy to commit Hobbs Act robbery charge was new testimony from co-conspirator Thurston Cooper. Cooper, who was incarcerated at the time of the 1994 shootout, had refused to testify at the first trial. He changed his mind after being sentenced to 25 years in prison for his participation in a string of carjackings and an aggravated assault. He now agreed to cooperate with the government, in exchange for consideration for a sentence reduction (that he later received). Cooper testified at the new trial, that began in September 1997, and related the facts regarding the robbery conspiracy set forth above.[2] Cooper also bolstered the government's proof regarding Williams' involvement in the March 1994 shootout, stating that he had spoken with Williams in October 1994 while both were incarcerated in the same facility. Cooper testified that he asked Williams if he had ordered the other squad members to shoot at the FBI agents, and Williams responded, "Bosses give orders."[3]

---

[2] On May 13, 1997, codefendant Tremaine Jackson pled guilty to all of the counts in which he was charged in the superseding indictment, and also agreed to cooperate. He too testified at the new trial, along with ten other witnesses. Williams thus was tried alone at the retrial.

[3] Later, at sentencing of Williams, the district court denied a leadership enhancement under U.S.S.G. § 3B1.1 with regard to the robbery conspiracy, finding that the group committed robberies on many occasions

*continued* . . .

On September 24, 1997, after an eight-day trial, the jury found Williams guilty of all charges. At a sentencing hearing on February 10, 1998, the court sentenced Williams to a total of 384 months' imprisonment, that included a 60-month consecutive term on the 924(c) charge in Count Eight. This sentence was 50 months above the earlier judgment, reflecting the new evidence and charge concerning the year-long robbery conspiracy.

### D.    Other Prosecutions and Conduct in Prison.

But for the fact that he committed additional crimes, Williams would have completed his 384-month sentence in this case in 2022. Specifically, after he served 28 years, 3 months, and 11 days, with credit for good conduct time, BOP deemed the 384-month sentence completed on June 27, 2022. But Williams was convicted in two other federal cases.

First, for escape. On February 10, 1998, after the sentencing hearing that day in this case, the Marshals transferred Williams to the Philadelphia prison system to await designation to a federal facility. The next day, Williams and many other inmates were transferred on a bus to the

_____

without specific leadership. But the court applied the leadership enhancement for the shooting of the agents, stating, "there's no doubt in my mind that – as the actual shooting offense – that that was – that this particular crime was Mr. Williams' leadership and organization." App. 250. "He commanded the shooting and I think there is an abundance of evidence to support that. The gun – the gun that was used in the shooting was obtained by Mr. Williams . . . ." App. 252.

Philadelphia Industrial Corrections Center (PICC). When the bus arrived at the facility, it paused outside the gate for a short time. During that period, Williams and another inmate slipped out of their handcuffs, forced open the rear door of the bus, and ran.

Two days later, on February 13, Philadelphia police, acting on a tip, found Williams and the other man hiding at a house in Philadelphia. Williams attempted to flee out the back door but was apprehended.

In No. 98-89 (E.D. Pa.), Williams was charged with one count of escape, in violation of 18 U.S.C. § 759. On February 27, 1998, Williams entered a guilty plea. On September 17, 1998, Judge William H. Yohn, Jr. imposed a sentence of imprisonment of 22 months, to run consecutively to any other state or federal sentence.

Second, Williams was convicted in the U.S. District Court for the Western District of Louisiana, in No. 06-10017, of assault on a prison guard, in violation of 18 U.S.C. § 111. That incident occurred on March 8, 2006, when Williams, then 31 years old, was an inmate at USP Pollock in Louisiana. Williams attacked a guard, repeatedly punching him, causing the guard to suffer bruises, vision loss, and headaches. During the assault, as other officers rushed to assist, Williams backed away, then pulled out a homemade shank and swung it at the officer. Williams later claimed that

this officer had inappropriately touched Williams during a patdown search earlier that day; the officer denied that. Williams was found guilty by a jury on October 31, 2006, following a two-day trial. On February 16, 2007, the court imposed a sentence of imprisonment of 150 months, to run consecutively to the other sentences Williams was serving. This term was near the top of the applicable guideline range of 121 to 151 months. The judgment was affirmed on appeal, *United States v. Williams*, 520 F.3d 414 (5th Cir. 2008), and Williams' motions for post-conviction relief were unsuccessful.[4]

With the sentence of imprisonment in the instant case completed, BOP aggregated the terms imposed in the escape and assault cases, totaling 172 months. Williams began serving those terms on June 27, 2022. Prior to the resentencing at issue in this appeal, Williams' minimum release date (if he earned all available good conduct time) was October 10, 2034.

Williams' behavior in prison was exceedingly poor. He incurred 46 disciplinary infractions during his 29 years in custody. Many of these infractions are for serious offenses such as assault and fighting. The most recent were for possessing a dangerous weapon (a pointed metal blade

---

[4] The Fifth Circuit opinion describes the facts of the assault in great detail. *See* 520 F.3d at 417-19, quoted by the government to the district court here at App. 339-42.

found in his cell) on November 11, 2021; possessing a hazardous tool (a cell phone and wireless earbuds) on April 13, 2022; phone abuse-disrupt monitoring on February 14, 2023; and possessing an unauthorized item (December 23, 2023). Supp. PSR ¶ 14.

### E.   Post-Sentencing Proceedings in the Instant Case.

Throughout the proceedings in this case, at sentencing and consistently thereafter, Williams proclaimed his innocence of the robbery and assault charges.

Williams filed an appeal, presenting six issues for review: (1) whether there was sufficient evidence to support the conviction for a Hobbs Act robbery conspiracy; (2) whether Williams knowingly and voluntarily waived his rights when he gave post-arrest statements to law enforcement officers; (3) whether the court properly instructed the jury about the essential elements of the charge of attempted killing of federal agents in violation of 18 U.S.C. § 1114; (4) whether the testimony of cooperating witnesses was excludable as incredible; (5) whether a prosecutor committed misconduct during the rebuttal argument; and (6) whether the court erred in applying a 2-level leadership role enhancement for Williams' instigation of the shooting. The Third Circuit denied all of Williams' arguments and

affirmed, in an unpublished opinion in No. 98-1130. The Supreme Court denied a petition for certiorari.

Williams' initial motions under 28 U.S.C. § 2255 and for a new trial were denied.

Then, on June 19, 2016 (DDE # 412), on behalf of Williams, the Defenders Association filed another motion for relief under Section 2255, challenging the 924(c) conviction in Count Eight on the basis of the decision in *Johnson v. United States*, 576 U.S. 591 (2015), which invalidated the "residual clause" in the definition of "violent felony" in the Armed Career Criminal Act. Williams argued that the identical residual clause in the definition of "crime of violence" in Section 924(c) is likewise invalid, and without it his conviction of the 924(c) charge may not stand.

The district court stayed the matter. Then, in *United States v. Davis*, 588 U.S. 545 (2019), the Supreme Court invalidated the 924(c) residual clause. On August 27, 2019 (DDE # 415), the Third Circuit approved the filing of a successive 2255 motion in this case based on *Davis*, and Williams' June 2016 motion was refiled in the district court on the same day (DDE # 416).

Williams' counsel then conceded that the motion "cannot succeed" under "Third Circuit authority" establishing that at least some of his

offenses remained crimes of violence that sufficiently supported his Section 924(c) conviction. DDE # 425 at p. 2. Williams submitted a pro se filing objecting to these concessions. DDE # 426.

In 2022, the district court (Brody, J.) denied Williams' Section 2255 motion on the basis of counsel's concession. DDE # 431. But Williams obtained new counsel and moved for reconsideration, disavowing his prior counsel's concessions. DDE # 450. He now argued that none of his offenses were crimes of violence, and in the alternative that his Section 924(c) conviction should be vacated even if only some of the predicate offenses qualified as crimes of violence. On November 3, 2023, the court granted Williams' request for reconsideration, and vacated the 924(c) count of conviction. App. 26-52.

The 924(c) charge in Count Eight was premised on numerous predicates: conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (charged in Count One); conspiracy to assault and kill federal agents, in violation of 18 U.S.C. § 371 (Count Two); attempt to kill federal agents, in violation of 18 U.S.C. § 1114 (Counts Three and Four); and assaulting a federal agent with a deadly weapon, in violation of 18 U.S.C. § 111 (Counts Five and Six).

In its opinion on November 3, 2023, the court confirmed that the crimes of attempt to kill federal agents, and assaulting an agent with a deadly weapon, continue to categorically qualify as "crimes of violence" under the 924(c) elements clause. App. 32-37. At the same time, the court stated, as the government had conceded, that the two conspiracy counts cited as predicates do not suffice. Over the government's objection, the court concluded that the error presented – presentation of a 924(c) charge based on both valid and invalid predicates – may not be deemed harmless in this instance, because there is at least a "reasonable possibility" that the jury rested the 924(c) conviction on an invalid predicate. App. 37-52.

The court proceeded to resentencing, conducting a number of hearings.[5] At the first hearing, on March 27, 2024, the defense presented the testimony of Williams' mother, Dorothy Williams Dabbs, who stated that Williams "was a real nice boy" as a young man, who "just got into a little something." She denied that he committed the crimes for which he was convicted here, rejecting the notion that he engaged in the year-long spree of exceedingly violent robberies. App. 309-16. The defense also called

---

[5] Although Williams completed the term of imprisonment he challenged, this motion under § 2255 was permissible where he continued to serve a term imposed to run consecutively to that sentence. *Garlotte v. Fordice*, 515 U.S. 39, 45-47 (1995); *Defoy v. McCullough*, 393 F.3d 439, 442 (3d Cir. 2005).

Honan Abdi, a resident of the Netherlands, who testified that she met Williams online, during his incarceration, and they had been married for 11 years. She stated a positive appraisal of his character. App. 317-18 ("He's God fearing, and he's very positive and very strong, given the circumstances that he's been through for the last 30 years.").[6]

In a subsequent filing, supported by exhibits, the government criticized this testimony. It maintained that Ms. Dabbs' testimony was of little value, as she apparently had no knowledge at all of her son's actual conduct as a young man and while in prison. As for Abdi, the government presented evidence calling into question whether she was actually married to Williams, and showing other inconsistencies between her testimony and government records. App. 335-38, 344-50.

The next hearing occurred on September 17, 2024. At that proceeding, Agent Macko, one of the victims of the March 1994 shooting, addressed the court. He spoke in graphic detail about his near-fatal shooting and its "terrible" effects on him and his family, as well as his anguish over Williams' assault on a prison guard, and expressed his "strong

---

[6] The third witness was Hakeem Harris, who said he is the defendant's son and that his father has been incarcerated throughout Harris' life. Harris stated that his father has been supportive, and that he would like for him to be released so they can develop a relationship. App. 324-27.

opinion that his sentence should not be reduced and that he should serve the full terms for the very serious crimes he committed." App. 434; *see id.* at 427-33. The government also filed a much lengthier written statement by Agent Macko presenting similar information and views. App. 356-66.[7]

Agent Macko urged the court to reimpose the same sentence "as a penalty for his conduct and, most importantly, to protect the public. To protect the brave law enforcement officers on the street and in our prisons who do the dangerous job every day of trying to keep . . . our society safe from violent offenders." App. 435.[8]

After Agent Macko finished testifying, defense counsel announced that Williams wished to "speak to Agent Macko and apologize." App. 437.

---

[7] This statement was consistent with Agent Macko's remarks at the previous sentencing proceeding in 1998, when he described the harm Williams caused to him and his family, stating in part, "It is my view that Melvin Williams is nothing more than a predator and a cowardly one at that. He hides behind others and he convinced stooges in his gang to act out his violence." App. 286. "We are on the front line to protect our citizens against predator[s] like Melvin Williams and we risk our lives on a daily basis, so our citizens may be safe. We only ask that the court system help us in this endeavor." App. 288.

[8] The government also presented a written statement of Travis Bordelon, the federal correctional officer who was the victim of Williams' 2006 attack. Bordelon, a resident of Louisiana, was unable to attend the hearings. He attested that he continued to suffer the consequences of the attack, fears for his safety in the event of Williams' release, and joined the government in opposing any sentence reduction. App. 351-52.

Once Williams had the floor, however, he launched into a lengthy statement addressing whether he ever initiated a plan to shoot police officers, or ordered his compatriots to open fire on March 16, denying responsibility for those actions. App. 438-41. Only after the court tried to redirect Williams to his promised apology did he express remorse for Macko's suffering, while still denying any role in causing it. App. 442. Williams stated:

> I just wanted to apologize . . . to you and to say to that day, I still stand on my words that I no have – never had no reason to direct anybody to do anything to you. I apologize that you had to go through that, you and your family and everything else. But as I said – and I don't – I can't tell you nothing but the truth in front of this judge, this court, in front of God. I still never gave nobody no shooting or anything else or told anyone to shoot you . . . or any of your partners.

*Id*. Agent Macko responded, "I accept your apology," and the court stated, "That's terribly, terribly generous of you." App. 445.[9]

The court continued the matter. Two days later, Agent Macko sent the district court a letter in which he expressed a change of heart. Macko stated that he was "impressed" by Williams' performance at the resentencing hearing and the support he had received from his family. Agent Macko also

---

[9] Williams never relented in challenging his conviction and factual guilt. For instance, on September 10, 2024, even while these proceedings were pending, his counsel at Williams' insistence filed another meritless 2255 motion challenging the convictions (DDE # 490), to which the government responded the same day and which the court soon denied. Along the same lines, Williams' objections to the supplemental presentence report consisted of a demand for a new trial. *See* DDE 502 (Nov. 4, 2024).

suggested that he did not believe the assault on Officer Bordelon warranted a long sentence and that he "underst[oo]d" the district court's belief that Williams would have received different "'justice'" in that case "had a Pennsylvania Jury made the decision."[10] Agent Macko concluded that he had given the matter great thought, and "God willing, Melvin Williams will be granted the freedom he seeks." App. 465-66.

At the next hearing, on January 23, 2025, the court determined that it would appoint a psychologist to evaluate Williams. It also heard from more character witnesses for Williams, including several who had been incarcerated with him. App. 473-74.

The psychologist's report that the court ordered was issued several months later. It uncritically assumed that almost every statement, excuse, and promise that Williams and his friends and family had made over the years was true, and contained little or no analysis of the circumstances of his offenses or evidence that cut the other way. Although the report acknowledged that Williams was "at a medium risk for recidivism," it

---

[10]  Macko was referencing a statement by the district court during the September 17 hearing, where after a prosecutor noted that "a jury in Louisiana found him guilty beyond a reasonable doubt," the court responded, "I wish it had been a jury in Pennsylvania." App. 448.

concluded that he had made good progress toward rehabilitation and would likely do well if released. App. 497-509.[11]

The court held a final resentencing hearing on May 7, 2025. At that time, the government urged the court to preserve the original sentencing package by adjusting sentences on the remaining counts of conviction upward so that the overall sentence on the conspiracy, assault, and attempted murder charges remained 384 months of imprisonment. The prosecutor expressed great respect for Agent Macko and his act of compassion. But the government noted Williams' extreme offense conduct; the fact that resentencing was occurring only due to application of the categorical approach, which eschewed consideration of Williams' indisputably violent conduct in relation to the 924(c) charge, and thus had nothing whatsoever to do with Williams' actual conduct or history; his subsequent crimes (including his post-sentencing escape and the attack on Officer Bordelon more than a decade into Williams' prison term); his extensive history of misconduct in prison; and his consistent refusal to accept responsibility for his crimes, including multiple occasions during the

_____

[11] As one of many examples, the report repeated Williams' claim that his cousin Jermaine Lipscomb was a "victim[ ] of gun violence," without noting that Lipscomb died in the March 16, 1994, shootout after Williams ordered Lipscomb to open fire on FBI agents, who returned fire and killed him. App. 504.

sentencing hearing when he denied any responsibility for the robberies or shootings. The government also observed that the original sentence of 384 months, even without the 924(c) charge, remained within the current advisory guideline range of 360 months to life – and that indeed, due to post-offense guideline amendments heightening the suggested punishment for attacks on law enforcement officers, the recommended guideline sentence under current law would be life imprisonment. App. 515-25; *see also* App. 447-56.[12]

Williams' counsel sought a reduction of the collective sentences to time served, asserting that, at age 49, Williams had matured, was rehabilitated, and would succeed with the support of his family and friends. App. 526-31. Williams himself engaged in a dialogue with the court, in which he attested that he is rehabilitated and prepared to reenter society. App. 532-41.

The court reduced the sentence to 271 months, a reduction of more than nine years, with the goal of assuring Williams' release. The court

---

[12]  The supplemental PSR found that the current range under the applicable 1993 manual was 360 months to life. The court adopted this finding. App. 512. The government noted that while the current manual does not apply, as amended after Williams committed his crimes, the court may consider the Commission's current view in the exercise of its discretion. *United States v. Larkin*, 629 F.3d 177, 193-94 (3d Cir. 2010).

placed great weight on Agent Macko's letter ("[H]is capacity to forgive has been wonderful. Just really, really wonderful."), and on the psychologist's report. App. 539, 541-51. The court also concluded that Williams had taken steps to rehabilitate while in prison and had a wide support network of family and friends. *Id.*

After the hearing, defense counsel reported to the court that BOP's application of the new sentence did not in fact produce Williams' immediate release, but instead set a release date in January 2027. The court promptly, on May 14, 2025, entered an amended judgment declaring a sentence of 251 months. App. 11-18. That too proved inadequate, and later that day the court amended the judgment further, to provide for a sentence of 247 months (over 11 years below the original term). App. 19-25. Williams was released from federal custody on May 15, 2025, and is currently on supervised release. This government appeal of the court's 2255 ruling followed.

## STATEMENT OF RELATED CASES

The government is not aware of any other related case or proceeding that is completed, pending, or about to be presented before this Court or any other court or agency, state or federal.

# SUMMARY OF ARGUMENT

The district court erred in invalidating a conviction under 18 U.S.C. § 924(c) and proceeding to resentencing of the defendant.

The 924(c) charge in this case rested on multiple predicates: two conspiracy charges, and substantive charges of assault on federal agents, and attempt to kill federal agents. The court correctly held that the conspiracy charges no longer stand as valid "crime of violence" predicates under Section 924(c), while all of the substantive charges do.

In this situation, the 924(c) conviction should stand. The controlling fact is that the jury convicted beyond a reasonable doubt on every count, including the substantive assault and attempted murder charges. Those substantive charges rested exclusively on the allegation that on March 16, 1994, Williams provided a .380 caliber firearm to his confederate Jackson, and then upon the approach of FBI agents ordered his companions to open fire, which Jackson and Lipscomb promptly did (with Lipscomb firing that weapon after Jackson did). There is no scenario in which the jury could have convicted of these substantive counts and not also concluded that Williams through the same conduct aided and abetted the "use" of that firearm in violation of Section 924(c), exactly as charged in the superseding indictment. In this situation, where a 924(c) conviction rested on an invalid

conspiracy charge and valid substantive counts, all addressing exactly the same conduct, this Court's 2020 decision in *Wilson* directs that the 924(c) conviction stands.

The district court's conclusion otherwise was erroneous. First, it appeared to apply the wrong test, focusing at times on the *Chapman* harmless error test applied in *Wilson*, which requires the government to show beyond a reasonable doubt that there was no "reasonable possibility" that the error affected the verdict. In actuality, the narrower *Brecht* standard is applicable on habeas review, allowing relief only where there is a showing of actual prejudice; the Supreme Court has instructed that a "reasonable possibility" of a different result is insufficient.

And the court further erred even in finding a possibility of a different result from a properly instructed jury. It focused on the fact that the 924(c) charge rested on two separate matters: a year-long robbery conspiracy (charged in Count One) in relation to which, it was alleged in the 924(c) count, Williams carried two firearms; and the March 16, 2024, shootout, regarding which the 924(c) charge alleged that Williams aided and abetted the "use" of a different firearm he supplied to Jackson. The court speculated that it would have been "simple" for the jury to rest its 924(c) conviction only on the first matter, and that the jury might have been "confused" with

regard to the different allegations and weapons involved, such that there is a possibility the jury did not rely on the counts related to the shootout when convicting under Section 924(c).

This speculation is both unconvincing and inappropriate. It does not remotely show actual prejudice under the *Brecht* standard. And it dismissed the actual verdict. The court speculated that the jury might have been "confused" as to which firearms related to which counts, but in fact, the trial court explicitly instructed the jury on that matter, and the jury is presumed to have followed those very comprehensible instructions. Further, as stated, with regard to the substantive charges related to the shootout, it would have been impossible for the jury to convict on those counts – which rested on the essential allegation that Williams gave a gun identified in the 924(c) charge to his compatriots and ordered them to fire – without also determining that this conduct equated to aiding and abetting the "use" of that firearm in violation of Section 924(c), as charged.

Where the jury, after being instructed explicitly regarding which guns related to which parts of the 924(c) count, did convict beyond a reasonable doubt on the charges related to the shootout, which remain valid predicates, and which involved identical conduct to that which

independently underpinned part of the 924(c) count, the court's rejection of

the 924(c) count on habeas review should be overturned.

## ARGUMENT

## THE DISTRICT COURT ERRED IN GRANTING
## RELIEF UNDER SECTION 2255

### Standard of Review

A legal ruling in a motion under 28 U.S.C. § 2255 is reviewed de novo.

*United States v. Cepero*, 224 F.3d 256, 258 (3d Cir. 2000) (en banc).

### Discussion

The district court erred in granting the motion under 28 U.S.C.

§ 2255 of appellee Melvin Williams. That ruling should be reversed, and the

resentencing vacated.[13]

---

[13] In this appeal, the government challenges only the 2255 ruling, not the new sentencing determination.

The final sentence is quite troubling. Williams was the leader of an exceedingly violent robbery and drug-trafficking gang; he armed himself and his subordinates to the teeth; and he repeatedly drilled other gang members on how to kill as many police officers as possible if they were ever discovered. On the day of the shootout, he armed his subordinates with semiautomatic weapons and, upon seeing the FBI closing in, immediately ordered his subordinates to open fire. Two agents nearly died, and one of Williams's accomplices – his close cousin – was killed. To be sure, Williams was a very young man at the time. But as the years passed, he never accepted responsibility, and continued to commit crimes: he escaped from custody, brutally attacked a federal corrections officer, and committed a staggering number of disciplinary infractions involving assaults, weapons violations, and contraband. Several of those violations – including

*continued . . .*

The court held that a count of conviction under 18 U.S.C. § 924(c), for using and carrying a firearm during and in relation to a crime of violence, was invalid because the jury may have relied on a predicate offense that does not qualify as a "crime of violence" under current law. However, the court appeared to apply the wrong standard in resolving this issue, and under the correct standard, it is apparent that the 924(c) conviction

---

possessing a shank and contraband – occurred while his successive 2255 motion was pending.

The court, however, used the vacatur of Williams' Section 924(c) conviction and associated 60-month sentence as an opening to release him outright – even though he had far more than 60 months left to serve and his entire remaining sentence was mandated by the judgment of a different court for a different crime. The court essentially assumed the mantle of a parole board, weighing the costs of Williams' continued incarceration against his rehabilitation and the likelihood that he could be safely released. It credited the statements of Williams' family and friends; a one-sided psychological report, which acknowledged that Williams was at heightened risk of recidivism; and Agent Macko's change of heart. The court also intimated that Williams's sentence for the assault on Officer Bordelon, imposed by a federal court in Louisiana, was too long and would have been shorter if "a jury in Pennsylvania" had considered the case. App. 448. The court's final sentence nullified the Louisiana sentence and resulted in Williams' immediate release.

Notwithstanding these highly unusual and concerning circumstances, the government elects not to appeal the sentencing decision, recognizing the deference afforded to a sentencing judge, and as significantly, the fact that reversal of the court's plainly incorrect legal ruling regarding the 924(c) conviction serves the same purpose in voiding the resentencing proceeding.

remains valid as predicated on at least two "crimes of violence" found by the jury beyond a reasonable doubt.

Section 924(c) applies to a person who uses or carries a firearm during and in relation to a "crime of violence" or a "drug trafficking offense." Here, the 924(c) charge was premised on numerous "crimes of violence." The statute defines a "crime of violence" as "an offense that is a felony" and—

(A)  has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(B)  that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). In *United States v. Davis*, 588 U.S. 545 (2019), the Supreme Court invalidated subsection (B), the so-called "residual clause," as unconstitutionally vague, meaning that a predicate crime of violence may now qualify only under subsection (A), the "elements clause."

The application of the elements clause, in turn, rests on the strange "categorical approach." Under this approach, the facts of the offense at issue do not matter; what matters is whether the statute at issue categorically meets the pertinent federal definition. Applying the same approach to the question whether a crime meets the similar definition of "violent felony" in the Armed Career Criminal Act (ACCA), the Supreme

Court stated, "Facts . . . are mere real-world things—extraneous to the crime's legal requirements. . . . And ACCA, as we have always understood it, cares not a whit about them." *Mathis v. United States*, 579 U.S. 500, 504 (2016). "How a given defendant actually perpetrated the crime—what we have referred to as the 'underlying brute facts or means' of commission, [*Richardson v. United States,* 526 U.S. 813, 817 (1999)]—makes no difference; even if his conduct fits within the generic offense, the mismatch of elements saves the defendant from an ACCA sentence." *Mathis*, 579 U.S. at 509. *See United States v. Davis*, 875 F.3d 592, 604 (11th Cir. 2017) ("the true facts matter little, if at all, in this odd area of the law").

Thus, with respect to Section 924(c), following elimination of the residual clause, a crime categorically qualifies as a "crime of violence" only if the offense at issue requires proof in every instance of the "use, attempted use, or threatened use against the person or property of another." Application of the elements clause "does not require—in fact, it precludes— an inquiry into how any particular defendant may commit the crime. The only relevant question is whether the federal felony at issue always requires the government to prove—beyond a reasonable doubt, as an element of its case—the use, attempted use, or threatened use of force." *United States v. Taylor*, 596 U.S. 845, 850 (2022).

In this case, the 924(c) charge in Count Eight was premised on numerous predicates:

- conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count One)

- conspiracy to assault and kill federal agents, in violation of 18 U.S.C. § 371 (Count Two)

- attempt to kill federal agents, in violation of 18 U.S.C. § 1114 (Counts Three and Four)

- assaulting a federal agent with a deadly weapon, in violation of 18 U.S.C. § 111 (Counts Five and Six)

The government maintained, and the district court agreed, that the first two of these two charges (conspiracy) no longer qualify under current law as a 924(c) "crime of violence," but the other two do.

A conspiracy offense does not qualify because it may rest solely on an agreement, without any actual use, attempted use, or threatened use of force to carry out the agreement. *See, e.g.*, *United States v. Barrett*, 937 F.3d 126, 129 (2d Cir. 2019); *United States v. Simms*, 914 F.3d 229, 233-34 (4th Cir. 2019) (en banc) (the government concedes the point and the court agrees); *United States v. Lewis*, 907 F.3d 891, 894-95 (5th Cir. 2018); *Brown v. United States*, 942 F.3d 1069 (11th Cir. 2019) (per curiam).[14]

---

[14] And thus, the oddity of the categorical approach is on full display here, where both of Williams' conspiracies – to commit a year-long series of

*continued . . .*

On the other hand, assault of a federal agent with a deadly weapon, in violation of 18 U.S.C. § 111(b) (Count Five and Six), qualifies as a "crime of violence" under the elements clause. *United States v. Bullock*, 970 F.3d 210 (3d Cir. 2020) (applying the identical elements clause that appears in the career offender guideline, U.S.S.G. § 4B1.2(a)).[15] So does attempted murder of a federal agent, in violation of 18 U.S.C. § 1114. *See, e.g.*, *United States v. States*, 72 F.4th 778, 783-91 (7th Cir. 2023). The district court properly so held. App. 32-37.

In this situation, where the 924(c) charge rested on both valid and invalid predicates, the conviction should be upheld. That conclusion rests on an elemental fact: the jury convicted on every one of the substantive charges alleging the valid predicate acts – all involving assault or attempted

---

robberies, and then to attack FBI agents – were exceedingly violent, but the offenses nevertheless do not qualify, because somebody else might commit the same conspiracy offense without engaging in violence. *See United States v. Scott*, 14 F.4th 190, 200-02 & nn.6-24 (3d Cir. 2021) (Phipps, J., dissenting) (providing a lengthy compendium of the unflattering descriptions and pejorative labels justices and judges have assigned to the doctrine).

[15] Appellate courts unanimously agree with this conclusion. *See, e.g.*, *Gray v. United States*, 980 F.3d 264 (2d Cir. 2020); *United States v. McDaniel*, 85 F.4th 176, 183-88 (4th Cir. 2023); *United States v. Rafidi*, 829 F.3d 437, 445-46 (6th Cir. 2016); *United States v. Butler*, 141 F.4th 1136, 1150-51 (10th Cir. 2025); *United States v. Bates*, 960 F.3d 1278, 1285-87 (11th Cir. 2020).

murder (Counts Three through Six) – and it is evident that it would have convicted on the 924(c) count if limited to consideration of those acts. And that conclusion is particularly compelled under the applicable standard for resolution of a habeas matter.

This issue is governed by *United States v. Wilson*, 960 F.3d 136, 151 (3d Cir. 2020). There, the defendants were charged with conspiracy, armed bank robbery, and Section 924(c) offenses that identified the conspiracy and bank robberies as alternative crimes of violence. The jury was instructed that either conspiracy or bank robbery "would count as a predicate crime for a § 924(c) conviction, as long as the jury found that the defendants had used or carried the gun to further the crime." The jury then returned a general verdict of guilty on all counts.

This Court applied the harmless error test of *Chapman v. California*, 386 U.S. 18 (1967), which places on the government the burden to prove beyond a reasonable doubt that a constitutional error "did not contribute to the verdict obtained," which it cannot do if "there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* at 23-24. Although this Court determined that the conspiracy offense should not have been included as a potential predicate offense, it found the error harmless because armed bank robbery remained a valid crime of

violence and the trial evidence and across-the-board guilty verdict foreclosed any "reasonable possibility that the jury based its § 924(c) convictions only on the conspiracy as opposed to the bank robbery counts." 960 F.3d at 151 (quotation marks omitted). Other circuits have reached the same result on similar facts.[16]

The facts of this case are, in relevant respects, directly analogous to those in *Wilson*, and moreover, in this 2255 matter the relevant standard of error is more solicitous of the verdict. The Supreme Court has repeatedly observed that collateral review – and particularly second-or-successive review – "is an extraordinary remedy" that "'will not be allowed to do service for an appeal.'" *Bousley v. United States*, 523 U.S. 614, 621 (1998)

---

[16] *See, e.g.*, *Stone v. United States*, 37 F.4th 825, 829-32 (2d Cir. 2022); *United States v. Said*, 26 F.4th 653 (4th Cir. 2022); *Baugh v. United States*, 64 F.4th 779 (6th Cir. 2023); *United States v. Hari*, 67 F.4th 903, 910 (8th Cir. 2023); *United States v. Reed*, 48 F.4th 1082 (9th Cir. 2022); *Johnson v. United States*, 139 F.4th 830, 841-43 (9th Cir. 2025).

As the district court observed, there have been a few appellate decisions rejecting a finding of harmless error in this situation. App. 49-50. All involve matters very different from the circumstances presented here. While this case involves a jury conviction on substantive charges that directly support a 924(c) conviction under current law, the few outlier cases present different scenarios. *See, e.g.*, *United States v. Heyward*, 3 F.4th 75, 77 (2d Cir. 2021) (vacating a 924(c) conviction on plain error review where the defendant was convicted of both a racketeering conspiracy (invalid predicate) and a narcotics conspiracy (valid predicate), without any substantive charge, and where the jury specifically found the firearm was discharged in furtherance of the first but not the second conspiracy).

(citation omitted). After the completion of direct review in a criminal case, "a presumption of finality and legality attaches to the conviction and sentence," *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993) (citation omitted), and courts are "entitled to presume" that the defendant's sentence is lawful absent compelling evidence to the contrary, *United States v. Frady*, 456 U.S. 152, 164 (1982). That "presumption of regularity . . . makes it appropriate to assign a proof burden to the defendant" on collateral review. *Parke v. Raley*, 506 U.S. 20, 31 (1992); *see Hawk v. Olson*, 326 U.S. 271, 279 (1945) (explaining that a prisoner necessarily "carries the burden in a collateral attack on a judgment").

Thus, the pertinent rules are different on collateral review, in terms of the standard to be applied. The "reasonable possibility" standard of *Chapman*, that this Court applied in *Wilson* (while still finding harmless error), does not apply here. The Supreme Court directed:

> [G]ranting habeas relief merely because there is a "'reasonable possibility'" that trial error contributed to the verdict is at odds with the historic meaning of habeas corpus – to afford relief to those whom society has "grievously wronged." . . . The imbalance of the costs and benefits of applying the *Chapman* harmless-error standard on collateral review counsels in favor of applying a less onerous standard on habeas review of constitutional error. The [proper] standard . . . is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." Under this standard, habeas petitioners . . . are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual prejudice."

*Brecht*, 507 U.S. at 637 (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946); other citations omitted).[17]

Accordingly, the Third Circuit's determination that the error in *Wilson* was harmless under the *Chapman* direct-appeal standard should *a fortiori* have produced the same result under the more verdict-friendly *Brecht* standard applicable to Williams' successive collateral attack. *See Fry v. Pliler*, 551 U.S. 112, 117 (2007) (referring to *Brecht* as applying a "less onerous standard on collateral review"). As explained, the jury was presented with six potential predicate crimes of violence and unanimously found Williams guilty of all of them beyond a reasonable doubt. That is unsurprising: the government presented overwhelming evidence not only that Williams personally used and carried guns throughout the course of the robbery conspiracy, but also that he provided the gun (a .380 caliber weapon) that first Jackson and then Lipscomb, upon Williams' order, used to shoot at and injure the two FBI agents. In light of that evidence, and the jury's verdicts finding Williams guilty of aiding and abetting both the attempted murder of the agents and the assault on the agents with a deadly weapon (all of which indisputably involved the use of firearms), it is

---

[17] This Court applies the *Brecht* standard in 2255 motions of federal prisoners as well. *United States v. Bentley*, 49 F.4th 275, 289 n.9 (3d Cir. 2022).

impossible to conclude that the jury logically could have found, much less actually did find, that Williams was guilty of a Section 924(c) offense based solely on the conspiracies and not on the use of firearms to commit assault and attempted murder. At the very least, there is no discernable basis on which Williams can show "actual prejudice" on those facts. *Brecht*, 507 U.S. at 637.

The district court's contrary holding is based on an incorrect application of harmlessness principles, both with regard to the applicable legal rule and the particular facts here.

Although the court cited *Brecht*, it appeared to apply the *Chapman* standard, granting relief based on the supposed "reasonable possibility" that the jury could have relied solely on Williams' Hobbs Act conspiracy offense in convicting him of a Section 924(c) offense. App. 51 ("In sum, *Wilson* directs this court to analyze Williams' verdict sheet and trial record to evaluate whether there was any 'reasonable possibility' that the jury based its § 924(c) convictions only on an invalid predicate.").[18] As

---

[18] The court similarly went astray in relying (App. 43-44) on *United States* v. *Theodoropoulos*, 866 F.2d 587 (3d Cir. 1989), *overruled on other grounds by United States* v. *Price*, 76 F.3d 526 (3d Cir. 1996), without acknowledging that that case, too, arose on direct appeal and applied a "possibility" prejudice standard inapplicable on collateral review, *see* 866 F.2d at 588, 598.

*continued . . .*

explained, that is the wrong standard. *Brecht*, 507 U.S. at 637; *see, e.g.*, *United States v. Said*, 26 F.4th 653, 660-62 (4th Cir. 2022) (explaining that, under *Brecht*, a defendant challenging his Section 924(c) conviction on collateral review "must show more than a reasonable possibility that the jury only found him guilty" based on invalid crimes of violence; "mere uncertainty as to which predicate or predicates the jury relied on . . . does not suffice to demonstrate . . . the sort of substantial and injurious error required for habeas relief") (brackets, ellipses, and quotation marks omitted). Even if the court were correct that it was "not possible to determine" from the jury's general verdict which predicates it relied upon, App. 42, or to "exclude the possibility" that any particular predicate or predicates were considered, *id*. at 44, those findings should have foreclosed Williams' request for relief under the proper standard.

The district court also made a strained and ultimately unpersuasive attempt to distinguish *Wilson*. The court asserted that, unlike in *Wilson*,

---

The court at various points did recognize that the *Brecht* standard is satisfied only where the reviewing court harbors "grave doubt," such that it is "in virtual equipoise as to the harmlessness of the error." App. 39 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)). The court further acknowledged that "[t] must be more than a 'reasonable possibility' that the error was harmful." App. 39 (citing *Brecht*, 507 U.S. at 637). But the court in its opinion repeatedly returned to the "reasonable possibility" test.

the valid and invalid predicates in this case were not "inextricably intertwined," such that "no rational jury could have found guilt" based on some but not others. App. 46-49. Here, though *Wilson* makes no reference to an "inextricably intertwined" requirement, the court was referring to a term used by other courts when assessing that a 924(c) conviction resting on valid and invalid predicates may stand. Regardless, the test is satisfied here in any event. As will be explained, the use of a firearm on March 16, 1994, was indeed "inextricably intertwined" with the related conspiracy charge in Count Two. This is clear upon examination of the charging document and jury instructions.

In this case, the trial court carefully explained to the jury, after consulting with the parties, how the 924(c) charge related to the two alleged conspiracies and associated substantive counts. The 924(c) count specifically listed three firearms that were alleged used or carried during and in relation to crimes of violence: two .38 caliber revolvers that Williams possessed (but did not use) on March 16, 1994; and the .380 caliber semi-automatic pistol that Williams provided to Jackson and that first Jackson and then Lipscomb fired, at Williams' direction, on March 16, 1994. App. 111.

The trial court instructed the jury that the first two guns related to the robbery conspiracy charged in Count One, that persisted for a year and ended with the agreement to commit a robbery on March 16. The court stated that the .380 caliber, as charged against Williams, related to the second conspiracy charge, to assault and attempt to kill federal agents, and the associated substantive counts.[19]

The trial court instructed the jury accordingly. It instructed that a 924(c) conviction could rest on any of the six alleged predicate counts, but the jury had to be unanimous with respect to at least one, and also

---

[19] This charge was faithful to the superseding indictment. The conspiracy count added in that document (Count One) set forth at great length a conspiracy, "from March 1993 to on or about March 16, 1994," to "unlawfully take and obtain narcotics, including crack cocaine which was to be resold, and United States currency from various drug dealers against their will, by means of actual or threatened force, violence and fear of injury, immediate and future, to person and property, in violation of Title 18, United States Code, Section 1951." The charge presented extensive detail of the existence of Williams' "squad," the exceedingly violent acts in which the members engaged, and the arsenal of weapons they amassed to carry out violent armed robberies during a one-year period. Notably, this charge did not include the shootout with agents as part of the conspiracy, which was carefully carved out as a separate matter. With respect to the events of March 16, 1994, the conspiracy charge in Count One limited its reference to the manner in which the group's goal that day was part of the robbery conspiracy, that is, that the conspirators set out to rob a drug dealer in order to obtain bail money for a confederate, and armed themselves for that purpose. The circumstances of the shooting are not included. App. 101-02.

unanimous regarding which gun was used or carried. App. 170-71. After further discussion with counsel, the court added:

> In regard to the firearm charge – the two guns which were allegedly found on the person of Mr. Williams, those guns are connected only to the government's theory as it relates to Count One of the indictment, the Hobbs Act violation. The gun that – or said to have been carried and used by Mr. Williams which are referred to in Count Eight and in regard to – was a weapon, which I don't know the exact exhibit number, but it is a weapon which allegedly Tremaine Jackson fired. . . .

> Exhibit 1. And it is that .380 which is the basis for the government's allegations as it relates to use in carrying of the weapon in relation to Count Eight. So that the two guns on his person relate only to Count One.

App. 181-82. The court thus instructed, with the parties' agreement, that the 924(c) count alleged only the "carrying" of Williams' weapons on his person, and only in relation to Count One, while the allegation of "use" related to the gun that Williams handed to Jackson on March 16 and that he fired.

Addressing this situation in its ruling on Williams' 2255 motion, the district court correctly stated: "the government presented two distinct theories under which the jury could convict on Count 8. The first theory involved Williams carrying firearms during and in relation to the Count 1 conspiracy to commit Hobbs Act robbery, a now-invalid predicate. *See* ECF No. 335 at 6, 60-61, 69-70. The second theory involved Williams aiding and

abetting the use of firearms by his co-conspirators during and in relation to Counts 2-6, which includes an invalid predicate (Count 2) and valid predicates (Counts 3-6)." App. 37. The court then concluded:

> The error in instructing the jury to consider the first theory had a "substantial and injurious effect or influence." *Brecht*, 507 U.S. at 638. The evidence presented at trial strongly supported a conviction based on the invalid first theory. The jury was charged that, for both theories under Count 8, "[t]he government is required to prove that the firearm was in the defendant's possession or under defendant's control at the time that a crime of violence was committed. The government must prove that the firearm furthered the commission of the crime or was an integral part of the underlying crime being committed." ECF No. 335 at 57. These elements were simple to find under the first theory given that the Parties stipulated at trial that Williams was carrying the two relevant guns on March 16, 1994. ECF No. 333 at 125. Moreover, as defense counsel stated, "by the defendant's own admissions in his statements to the police and the FBI [the two guns Williams carried] were part of the plan to commit the armed robbery." ECF No. 335 at 9.

> By contrast, a jury finding that the firearms at issue under the second § 924(c) theory were "in the defendant's possession or under defendant's control," ECF No. 335 at 57, may have been complicated by the fact that those firearms were not found in his possession and were not fired by him.

App. 42-43. The court continued: "the jury might have confused which firearms related to which crimes of violence, and therefore might mix and match a predicate 'crime of violence' and predicate firearm to reach a § 924(c) conviction. As defense counsel summarized, 'I think it's so confusing which [guns] were carried for what.'" App. 43 (quoting App. 172). The court added: "given that the jury was asked to select one theory under

which to convict Williams for violating § 924(c), it is entirely plausible that the jury considered the firearms that Williams admittedly carried in relation to Count 1 as more strongly supporting a § 924(c) conviction than the firearms used under an aiding and abetting theory of liability in relation to one of the offenses charged in Counts 2-6." *Id*. at 43 n.8.

This conclusion contains layers of errors.[20] First, as stated above, it waters down the applicable standard. The question here is not what was "entirely plausible," but whether the defendant has shown actual prejudice.

---

[20] The court's novel analysis was not previously presented by the defense, and thus the government had not addressed it in detail. The government's position, as now, was that *Wilson* controls and directs that a 924(c) charge resting on valid and invalid predicates should be sustained where the jury convicted of substantive charges which are valid predicates, and that was the case here in light of the convictions on the substantive assault and attempted robbery charges. *See* DDE # 451 at pp. 6-10.

For its part, the defense made different arguments that the district court did not adopt. First, the defense argued that even Counts Three through Six do not qualify as "crimes of violence" because they rested on aiding and abetting liability (a proposition later rejected in *United States v. Stevens*, 70 F.4th 653, 661-62 (3d Cir. 2023)); that *Wilson* was wrongly decided; and that all of the charged predicates were not sufficiently intertwined. The defense stated cursorily (in an analysis not adopted by the district court, in lieu of its own idiosyncratic approach): "Count 1 is conceptually distinct from Counts 3 through 6 because it is the only predicate based on Mr. Williams's own guns. (ECF # 335 at 69); *see also* (ECF # 426 at 8). Counts 3 through 6 are conceptually distinct because they are based on an aiding-and-abetting theory and a separate incident. On this record, the trial court's error in instructing the jury that Counts 1 and 2 are § 924(c) predicates is not harmless." DDE # 450 at 9.

*continued . . .*

And the court's speculation about the jury's decision-making is both inappropriate and unpersuasive. It may be that it was "simple to find" guilt under Section 924(c) based only on the first conspiracy charge, regarding the robbery conspiracy. But it is untenable to speculate that the jury could have been "confused which firearms related to which crimes of violence," where the trial court gave explicit instructions on that point that the jurors are presumed to have followed. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987) ("This accords with the almost invariable assumption of the law that jurors follow their instructions, . . . which we have applied in many varying contexts.").

Further, the jury's verdict necessarily includes a determination that Williams aided and abetted the use of a firearm on March 16, 1994, in violation of Section 924(c). The jury convicted Williams of the substantive charges in Counts Three through Six, finding that he aided and abetted the effort by Jackson and Lipscomb to assault and attempt to kill federal

_____

In a later submission, the defense presented additional arguments that the court did not accept, in arguing that even Counts Three through Six are not valid predicates: that the mens rea requirement for attempted murder in violation of § 1114 does not suffice; and that both § 111 and § 1114 do not qualify because they include attempt offenses. DDE # 456. The government rebutted those arguments, DDE # 457, and will address those claims before this Court at its direction or in a reply brief if they are renewed by Williams in this appeal.

agents. It could only reach this conclusion by determining, beyond a reasonable doubt, that Williams gave the order to fire the .380 caliber weapon that he had provided to Jackson. In fact, as the district court noted, this is exactly what defense counsel herself said to the jury in closing argument: "With respect to Counts 2 through 6, the [only] way you could find him guilty of [Count 8] would be if you believed that Melvin Williams gave Termaine Jackson and/or Mr. Lipscomb the guns for the purpose of attempting to kill the FBI agents." App. 41 n.6. There is simply no scenario in which the jury could have reached its conclusion regarding the substantive charges in Counts Three through Six and, if limited to these predicates in its consideration of the 924(c) charge, not also have convicted on the 924(c) count for use of a firearm in relation to a crime of violence.

This case is a replay of *Wilson*. Here, when one focuses on the jury verdict, absent the district court's speculation of alternative occurrences, there is indeed no "reasonable possibility" of a different result on the 924(c) charge under the *Chapman* standard. There has certainly been no showing by Williams of actual prejudice under the applicable *Brecht* standard. *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam) (a "State is not to be put to th[e] arduous task [of retrying a defendant] based on mere

speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error.").

Drilling down, it is clear that the jury convicted Williams on the substantive charges of assault on federal agents, and attempt to kill federal agents, in addition to the conspiracy charges. The sole basis for the substantive counts as to Williams, in the government's presentation, was that upon the approach of FBI agents Williams gave the order to shoot, which Jackson proceeded to do first. There is no possibility that any rational jury would convict on these substantive counts on this theory, and not also find that Williams was responsible for Jackson's "use" of the gun in violation of Section 924(c), independently of any conspiracy count. The fact that a 924(c) conviction could readily have rested on Count One as well should not be relevant. The court's opinion seems to presume that because the jury was told it could convict under Section 924(c) based on only one predicate, it was precluded from finding multiple predicates. That of course is incorrect, and the verdict here strongly suggests that the jury in fact necessarily found multiple predicates.

The situation thus in the end matches *Wilson*, as both the assault/attempted-murder conspiracy charge in Count Two and the substantive assault and attempted murder counts are based on precisely the

same acts. The district court itself acknowledged this, stating, "Had Williams' jury *only* been presented with the second theory, Williams' case would closely mirror *Wilson*, as defendants in both cases were found guilty of an invalid conspiracy and valid substantive offenses, either of which could have been used by the jury to form the basis for a § 924(c) conviction." App. 48. That recognition should carry the day.

A court may grant relief here only if it bears "grave doubt" about the trial result. *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). This case does not remotely support such a conclusion. This case involves a discrete set of facts in which a firearm was plainly used in furtherance of all of the substantive and valid predicate crimes for which Williams was charged and convicted. He does not show prejudice, or in reality, even a reasonable possibility of a different result if the 924(c) charge rested only on the attempted murder and assault charges. The 2255 motion should have been denied, and the district court's order should be reversed.

## CONCLUSION

For the reasons stated above, the government respectfully requests that the order of the district court granting relief under Section 2255, and imposing a new sentence on the defendant, be reversed.

Respectfully submitted,

DAVID METCALF
United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals
Pa. Bar No. 58126

United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
(215) 861-8568

# CERTIFICATION

1. The undersigned certifies that this brief contains 12,015 words, exclusive of the table of contents, table of authorities, signature block, and certifications, and therefore complies with the limitation on length of a brief stated in Federal Rule of Appellate Procedure 32(a)(7)(B).

2. I hereby certify that the electronic version of this brief filed with the Court was automatically scanned by OfficeScan Real-Time Scan Monitor, version 10.5, by Trend Micro, and found to contain no known viruses. I further certify that the text in the electronic copy of the brief is identical to the text in the paper copies of the brief filed with the Court.

*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this brief has been served on the Filing User

identified below through the Electronic Case Filing (DDE #) system:

Lawrence J. Bozzelli, Esq.
211 No. 13th Street, Suite 701
Philadelphia, PA 19107

*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney

DATED: September 5, 2025.